BREAUX, C. J.
Relator brought this suit against the respondent to obtain his disbarment as an attorney at law.
.The petition of relator contains a number of specific allegations regarding his conduct as an attorney at law while acting as counsel' of a Mrs. Winling, a seamstress of slight education and little or no business experience.
She employed him in the year 1901 to obtain a divorce on the ground of adultery of her husband, about the same time she employed him to protect her rights to property she owned.
Mr. Charles J. Théard was her attorney. She became impatient, as she was nervously anxious to obtain a divorce. He was disinclined to sue for a divorce. There was a child, issue of the marriage. He was disinclined on that account to institute suit.
She changed attorney, and employed respondent.
This incident has no immediate significance; it is referred to as part of the narrative of the case.
Relator avers that he charged her an excessive fee, and that he availed himself of the opportunity he had as jan attorney at law and of his influence to buy her property for an amount less than it was worth and to sell to her two lots of ground; that he resorted to separate suits to obtain her rights when he might by one suit have obtained them; that he advised his client to abandon her claim for alimony in the divorce proceedings.
As relates to the divorce: Relator alleges that respondent advised with and came to an understanding with the attorney of the defendant to obtain witnesses to prove the charges brought by his client; that the proceedings resulted in an imposition upon the court by whom judgment was rendered.
At the time that the respondent was employed he demanded and received $50 from his client as a retainer and to pay costs.
About the time that he was employed he learned from her, properly enough, that she had five lots of ground, acquired by her dur *1067 ing her marriage with paraphernal funds. The title was in her name, hut the' deed did not recite that it was acquired by her with paraphernal funds.
He also about the same time was informed by her that she owned 25 shares of gas stock, for which she held certificates in her name. This stock also was bought with her separate funds. This stock had been bought by her in her name.
He was informed that the husband of his client laid claim to this property as being community. This information was given in course of the employment.
There is an averment that he knew from conversations he had with her attorney, Mr. Théard, who had formerly attended to her business, that the lots and the gas stock had been acquired with her paraphernal funds.
Of this there is no serious question.
Before the client came to respondent’s office and employed him, when she was about to sell a lot of ground, she was annoyed by her husband, who employed counsel and demanded of her some $700 in satisfaction of some asserted right.
This amount the husband reduced to some $300 for some improvements he claimed to have made on the property, which was in the name of the wife. As she was anxious to sell the property, she finally concluded to let him have the amount, although she was well informed by her attorney at the time, Mr. Thcard, that he had no right to it.
From this, and possibly other incidents, the respondent says he conceived the idea, after he had been employed by Mrs. Winling, that the husband was not so much concerned about his wife as he was about her little property; that he would subserve the interest of his client by having the ownership fixed as being paraphernal; that the husband would then be less anxious, to defend the suit for divorce, which had not yet been brought
The respondent went to work to have it' decreed that it was paraphernal property. He advised his client to make a sale to an ostensible buyer; that before passing the sale-he would bring suit averring that the signature of the husband was necessary, and thereby obtain the authorization of the husband or of the court.
The client found a convenient purchaser, who doubtless did not feel apprehensive, for the price was nominal.
The suit was brought to have it decreed that the property was paraphernal; the husband answered and made a defense, which the relator characterizes as weak.
Judgment was rendered against the husband recognizing the right of the wife.
After this judgment had been obtained, the property was transferred to a vendee by the-name of Ohapon.
A day or two after the property was sold by Ohapon to a relative of the respondent,, or really to the respondent.
There was no price paid at either sale.
Time passed; no suit was brought for a divorce.
Now as to the gas stock in the name of Melanie Winling, owned by her:
In accordance with the respondent’s advice, the client consented to its sale. Respondent placed it in the hands of a broker, and directed him to sell it in his name.
After it had been sold, the gas company refused to recognize the sale, on the ground that Mrs. Winling needed the authorization-of her husband. The result was that that sale was never completed. It became necessary for the broker to furnish the buyer from him as broker with other stock in place, and, as the stock had increased slightly in value, it cost a broker’s commission, a small amount additional, $28.13, paid by the respondent, which the respondent charged to his client.
After this attempted sale, or, rather, sale *1069 which was never completed, the respondent returned the certificate of stock to his client; it was placed in an envelope and handed to her.
She, the same day or a short time thereafter, lost it — misplaced it in some way. The loss was advertised, and a bond had to be furnished. It was required by the gas company before giving a duplicate. This bond was signed by the attorney, respondent, who charged for his services as surety the sum of $100.
It seems that some comment was made by the client in matter of returning the certificate.
We may as well state here that that amounts to nothing; relator attaches no importance to it, and it forms no part of .the case. We merely refer to it in passing to say that it amounts to nothing. She must have lost it, and no blame can be laid at respondent’s door on that score.
After a new certificate of stock had been obtained from the gas company, respondent claimed that in April, 1902, Mrs. Winling sold him the stock for its market value, to wit, $116 per share.
No suit for a divorce had been brought.
The relator further charges that in June, 1902, while the relation and influence of attorney and client still existed, the attorney induced his client to buy from him .two lots of ground, one for $900, and the other for $1,400; and at the same time he bought the five lots from his client before mentioned.
She about the same time sold her gas stock to respondent.
The respondent testified that a verbal agreement was entered into in April, 1902, Jn which she consented to buy his two lots at the price before mentioned, and sell him the gas stock before mentioned.
In June following, he wrote to her and in? closed a statement.
As it is of some importance, it is inserted here:
“New Orleans, La., June 3rd, 1902.
“Mrs. M. J. Winling, City.
“Dear Madame: I beg to furnish you statement of the several matters I have had in hand for you as follows:
By purchase price of lots.$ BOO 00
By purchase price of stock. 2,900 00
$3,400 00
This amount has been expended as follows: Purchase price of No. 762 Peters ave. $1,400 00
Purchase price of 1120 Arabella street. 900 00
Gash handed you. 100 00
My fee in re lots. 10O 00
My fee in re stock sale, authorization and obtaining new certificate of stock . 300 00
My charge for bond required. 100 00
Paid I-I. L. Huntington, due by you 28 00
Taxes on lots. 12 00
Costs of sale to Chapón and certificates .*. 20 00
Estimated costs in divorce proceedings . 40 00
My fee in divorce proceedings. 400 00
$3,400 00
“I have itemized these charges, but my agreement with you was to let you have the above named property, pay these charges and myself for the transfer of the stock and lots to me. This I have carried out and I.trust it all meets with your approval.”
[Signed by the respondent.]
The Proceedings for a Divorce.
The suit for a divorce was afterward brought.
The question of alimony claimed by plaintiff against her husband came up between counsel. The counsel for the husband said to respondent that if that demand were abandoned there would be no defense made in the divorce proceedings. Respondent then spoke to his client and advised her to abandon the claim, which she did.
The default was confirmed and judgment of divorce rendered on December 22, 1902.
The record discloses that respondent was informed that the witnesses to prove the charge of adultery would be on hand; that there was no question about the facts being provable, and that the testimony would be forthcoming.
*1071 To quote from the testimony: Respondent states as a witness that he met Mr. Coats whom he knew, and that he introduced him to the witnesses who could prove up what was wanting in the Winling case. He obtained the facts from them, asked these witnesses what they would testify to, asked if they knew Winling, and the fact of the adultery, and the facts necessary.
We state the facts in the order of dates:
Mrs. Winling wished tci sell one of the properties she bought from the respondent by the sale to her. Although it contained the declaration that the property was bought with her paraphernal funds, she was again met with the objection from the one who thought of buying that the signature of the husband was necessary. This was one of the lots sold by respondent to his client. It was about in the same situation, as to title, as the property of the client was when she was advised by respondent to place it in the name of another.
She called on another lawyer than respondent, and the latter, through counsel for Win-ling, obtained the desired signature.
Some time thereafter the differences between counsel and his former client, two of his friends — one a well-known and highly reputable attorney, and another á well and favorably known notary — took the matter in hand, and finally obtained the consent, reluctantly, of respondent to an adjustment.
The fee was reduced to $350, and the parties were placed in the position they were before the property was transferred as before mentioned. Mrs. Winling became again the owner of the property which had been hers, and respondent went into possession of his.
Before concluding this statement of facts, we insert the following excerpt from the testimony of respondent:
“There was a bill due to Mr. Huntington for $28 and some cents, costs of court, taxes on her lots, certificate of sale, and the cost of the transfer of Chapón.
“You will find it all itemized here.
“I told her that I would stand all of these, charges as a part consideration of the deal we were making.”
It is charged that the defendant netted for his services $1,102, nearly one-third of the total property of the client-
There are a number of other details. We will close our summary and statements of the facts as these suffice for the decision.
Alimony.
To the abandonment of the alimony in itself, for which Mrs. Winling had sued, we attach no great importance. The purpose was, as stated, to facilitate the obtaining of the judgment of divorce and the custody of her child.
We will state it would have been best in the proceedings for a divorce not to dispose of whatever right she may have had to alimony.
Attorney and Client.
The attorney may expect too much of his client, and, on the other hand, the client may in some instances surrender too many rights, owing to the implicit confidence in the attorney.
In their transactions in the pending case it does look as if the attorney, as sometimes happens, overlooked the fact that he was dealing with a person whose will power was very much influenced by his own; that his profession naturally inspired confidence.
She consented to sell property; afterward to buy property; signed receipts, and gave clear acquittance to the attorney, accompanied by words of approval and even thanks. But after all this, on recalling her acts, she was seized with regret and doubtless indulged in complaints, and met with the sympathy that complaining clients almost always meet with when they state that they *1073 have signed away rights under the advice of their attorney which they should not have signed.
Even the merest color of truth in a case of this kind leaves the attorney with scant ability to do away with the impressions •created on the client and the ever-ready advisers and friends.
In order as much as possible to guard against the error into which attorneys have been known to fall in acquiring property of their clients, adversely to their clients’ interest, it has in some jurisdictions been laid down as a rule that, if an attorney goes too far and acquires property of his client adversely to the latter’s interest which he should not have acquired, he can be made at law to return it.
There is no question here of an attorney having acquired property of his client which •he can be made to return; he acquired it with her consent, given, it must be said, when ■she was nervously anxious to obtain a divorce, and to he permitted by the court to retain the custody of her child of tender years.
She testified that she was willing to part with all she had for the divorce and the custody of her child.
If, owing to the nervous anxiety of the client, she parted with the property, there is already a hardship.
It is advisable to decline to make sales to clients or buy their property, particularly if there is an unsettled fee, the amount of which has not been fixed, and, again, if the services are not rendered but to be rendered.
The objectionable feature here is that the attorney, without informing his client of the amount of the fee, bought her property, and .after he had bought he informed his client •of the amount of his fee.
The standard of professional conduct is before us for consideration.
In view of this standard, we must hold that the attorney must not deal with his client and become the owner of her property under the facts and circumstances developed here.
We will not deny for an instant to the attorney the right to secure his fee if that was the purpose, but to the end of securing his fee he should not go to the extent of becoming the owner of all her property, even though there is willingness on the part of the client in face of the fact that her property had been transferred.
We are of opinion that there was no necessity for the attorney to become the owner of the stock which was transferred to him at the time that it was transferred.
There was a verbal agreement, April, 1902, preceding the transaction, of which no written note was made and in regard to which we do not understand that attorney and client agree. There was no one present other than these two.
Respondent’s contention is that another agreement, that of June, 1902, shows the distribution of the proceeds of the property disposed of under the agreement of April, 1902:
“Under which agreement I agreed to sell to her or have transferred to her the city property No. 762 Peters avenue and 1126 Arabella street.”
In all these transactions, in matter of consideration, it does seem that the client was in a disadvantageous position; she had parted with everything, and the statement furnished her, showing excessive charges, was, doubtless, imposing.
She is a weak, uneducated woman, a seamstress, not familiar with the ways of business. The complaint would appear in a different light if it were from one having mental energy enough to fully protect her rights. She was entitled to full protection from her attorney.
Something related of Pothier may serve to illustrate, although not directly pertinent.
It is related by Prof. Duverger, of the *1075 Paris Law School, in a book of recent date, a copy of which we have in our possession.
Pothier had committed an error, and had thereby wronged a servant. Discovering it, it was a source of annoyance. The servant had left, and was at some distance when the error was discovered. It is related that Po-thier made it his duty to find the humble man and in person convey his regret to the servant, all confused by the expressions of regret of a great man.
This may have the appearance of altruism. It only manifested the desire not to impose on the weak and ignorant.
We are not inclined to go much further with this thought. It only shows the desire to correct the wrong — the desire to be strictly just. This feeling is not confined to any place nor to the people of any country.
Of course, there should be no great discrimination among clients. It remains that the lawyer owes special protection to the weak client.
By the by, in the pending case, the wrong committed was corrected, as far as it was possible to correct it as between respondent and his client through the interposition of the friends as before stated.
A few words in regard to the delay in instituting suit for a divorce:
There was delay in instituting suit for divorce. We are not inclined to scrutinize too closely the causes. During this delay, the property of the client passed to the attorney, and he sold property to her. Afterward the suit for divorce was brought.
The respondent’s reason for the delay was because he deemed it best in the interest of his client to temporize.
Be all this as it may, the delay does not seem to have placed the client in a better position.
It is said that by placing the property in the'name of a third person it would leave the husband without hope of recovering anything from the wife as belonging to the community ; it would enable the client better to get rid of him, and facilitate the obtaining of a divorce, as the husband would no longer have the same interest in opposing that demand.
The explanation is not convincing, particularly in view of the fact that the respondent sold the two lots before mentioned to hi® client, one for $1,400, and the other for $000, during the delay he deemed advisable.
Although it was recited in the deed from1 the respondent to his client that it was para-phernal property of the wife, it none the less remained subject to the husband’s claim, as-much as the other property of the wife transferred by her to the respondent had been subject to that asserted right.
As to the contingent fee, not admitted by the client:
Conceding for a moment that the client was advised about this fee, it remains there-was little necessity for such a fee. He had the property. There was no necessity for the client to give up a part in order to realize-the remainder.
As to the services to be rendered for the-divorce, they scarcely justified a contingent fee. The services to be rendered and which were afterwárd rendered were ordinary services which did not call for a large deduction from the amount in hand under the circumstances to which we have already referred.
The Divorce.
We come to another delicate subject — the complaint that the attorney for the husband produced evidence to assist in proving existing facts and facilitated the divorce.
We have heretofore given the facts as we-found them in the record. From them we-deduce that the parties, plaintiff and defendant, did not keep at arm’s length in matter of the divorce. The acts stated by relator go no further than as shown by the evidence. It is true that the record does not disclose *1077 there was suppression of facts, nor were facts manufactured or distorted.
But the witnesses were at court on the day that the default was confirmed on motion of respondent. They were present with the husband’s consent, and at his instance, we understand. They were interviewed by respondent, who must have known that they came from the adversary of his client.
Under our law, there must be no consent in matter of divorce. It is against its policy. Rev. Civ. Code, art. 140..
There should be no way made easy by agreement to a divorce. Even though the steps as just before stated were very limited, there was a wrong; the husband cannot give such information and contribute in obtaining the divorce by assisting in proving his own violation of his marriage ties. That which might be done by the husband if sanctioned in this respect might be done by the wife. She, also, in case of suit against her for divorce, might facilitate the husband in proving her matrimonial offense. That, indeed, would be a sad state. The mind on reflection recoils from the thought, and the possibility to which such an understanding might lead. That which was done, let us 'conceive, was done thoughtlessly. Yet it must be disapproved. Such conduct on the part of either of the spouses is wrong. One cannot benefit by his own wrong in a court of justice, is the maxim. Attorneys have it in their power to curb wrongs. They should not countenance them in any way in proceedings for a divqrce in any matter so material to the issue.
The Adjustment Between Attorney and Client.
This adjustment relates, let it be said, only to the financial part of the case. This adjustment is creditable to the friends of the respondent as well as to the respondent. They could not, unfortunately, obliterate the past — make that not to be which had been.
It remained as a fact, we will state as relates to the financial branch of the case, the: client had not received full consideration for the property the title to which she had parted with, and she would never have received full consideration except for the interposition of the friends of respondent, as before stated.
We are impressed by the fact that the friends of the respondent, to whom we have1 above referred, would never have consented to the adjustment as made if they had for an instant thought that the fee was reasonable and proper.
The amount agreed upon by them, upon which the adjustment was arrived at, as the' fee due by the client, shows that the client had not received full consideration in the-transactions which have engaged our attention.
Attorneys are not inclined to avoid the-courts when they think they are in the right. The theory for the adjustment does not fully explain.
The Constitution of 1898 brings within the original jurisdiction of this court in such matters as now before us such questions as-presented in the present case. From this it inevitably follows that a higher standard must be maintained. It is the inevitable effect of proper organization. If it is to be maintained (as it certainly should be), the questionable conduct of the members .of the bar will' be subjected to scrutiny that heretofore passed unnoticed.
The profession of law has many temptations — “pitfalls and mantraps,” says Judge-Sharswood in his popular Essay on Professional Ethics. To avoid them, prudence and self-denial are required. The desire to succeed, to obtain clients, and of securing their rights, may lead, if not held under some restraint, into dangerous paths.
We have at last performed our task in this case; with reluctance we reach our conclusion. From our premises it is in our opinion *1079 inevitable, and the only conclusion tliey will admit. Each fact and each proposition has been carefully considered and weighed.
In addition to the foregoing, the traditions ■of the American bar impel us to our conclusion. If there are those who can see a prop,er standard in an opposite view, it is our misfortune, perhaps, that we cannot agree •with them.
The law and the evidence being in favor of relator and against the respondent, it is ordered, adjudged, and decreed that judgment be, and the same is hereby, rendered suspending the respondent from practicing at •the bar for the term of 12 months.
It is further ordered, adjudged, and decreed that during that number of months he is suspended from practicing as an attorney at law and from appearing before the courts .of this state.
It is further ordered, adjudged, and decreed that he is to pay costs.
See dissenting opinion of PRO VO STY. J., .48 South. 463.